Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Ronald A. Guzman | Sitting Judge if Other than Assigned Judge | Martin C. Ashman |
|---|---|---|---|
| **CASE NUMBER** | 00 C 6391 | **DATE** | 8/27/2001 |
| **CASE TITLE** | Heather A. Ploog vs. Homeside Lending, Inc., et al. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]  Report and recommendation recommending that plaintiff's amended motion for class certification [43-1] be denied is hereby entered of record.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | |
| | No notices required. | | number of notices | 4 |
| ✓ | Notices mailed by judge's staff. | | | AUG 2 8 200 |
| | Notified counsel by telephone. | | date docketed | |
| | Docketing to mail notices. | | docketing deputy initials | |
| | Mail AO 450 form. | | | 8/27/2001 |
| ✓ | Copy to judge/magistrate judge. | | date mailed notice | |
| IS | courtroom deputy's initials | FILED FOR DOCKETING 01 AUG 27 PM 12: 33 | IS mailing deputy initials | |
| | | Date/time received in central Clerk's Office | | |

Document Number
104

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| HEATHER A. PLOOG, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 00 C 6391 |
| | ) | |
| v. | ) | Judge Ronald A. Guzman |
| | ) | |
| HOMESIDE LENDING, INC. and FIRST | ) | Magistrate Judge |
| CHICAGO NBD MORTGAGE CO., | ) | Martin C. Ashman |
| | ) | |
| Defendants. | ) | |

*DOCKETED*
*AUG 2 8 2001*

## REPORT AND RECOMMENDATION

Plaintiff, Heather Ploog, filed a putative class action suit against Defendant, HomeSide Lending, Inc., alleging violations of the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. §§ 2601-17. Specifically, Ploog stated that HomeSide engaged in a pattern or practice of failing to respond to borrowers' qualified written requests in accordance with § 2605(e)(2)(A)–(C). Further, Ploog asserted that HomeSide engaged in a pattern or practice of reporting borrowers to credit agencies within sixty days of receiving qualified written requests from them in violation of § 2605(e)(3). For relief, Ploog asked for statutory damages and costs, including attorney's fees, pursuant to § 2605(f).

Presently before this Court is Ploog's Amended Motion for Class Certification, which seeks certification pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3). For the following reasons, this Court recommends that Ploog's motion be denied.[1]

---

[1] This matter comes before this Court pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.1 for a report and recommendation.

104

# I.  **Background**

On April 30, 1998, Ploog and her husband purchased property at 4104 North Kenmore Avenue in Chicago, Illinois, with funds provided by First Chicago NBD Mortgage Company. To receive the funds, Ploog and her husband and First Chicago entered into a Security Instrument, which gave First Chicago a security interest in the Kenmore property and established an escrow account, funded by Ploog and her husband, from which First Chicago would pay real estate taxes, insurance premiums, etc.  From April 1998 to June 1999, First Chicago paid certain real estate taxes from the escrow account pursuant to the Security Instrument.

On June 4, 1999, after HomeSide acquired the Kenmore loan from First Chicago, HomeSide sent Ploog and her husband a letter informing them of HomeSide's acquisition of the loan, of the principal amount outstanding on the loan, and of the balance on the escrow account, which at the time was negative $5919.77.  HomeSide also provided Ploog and her husband with a new loan number and certain contact information in case of any problems relating to HomeSide's servicing of the loan.

Alarmed by the negative balance of the escrow account, Ploog promptly telephoned HomeSide on June 7 and asked for an explanation.  A HomeSide representative told Ploog that someone would look into the matter and contact Ploog.  If a HomeSide representative did not contact Ploog within thirty days, the HomeSide representative told Ploog to contact HomeSide again.[2]

---

[2] It is unclear whether or not HomeSide initiated contact with Ploog within the next thirty days.

Ploog did contact HomeSide again. In fact, over the next several months, Ploog repeatedly contacted HomeSide by letter and by telephone in relation to the negative balance on the escrow account. For instance, in a letter dated October 5, 1999, Ploog asked HomeSide to cancel the escrow account; Ploog wished to pay the Kenmore property's real estate taxes on her own.

As per HomeSide's computer records,[3] we know that HomeSide received Ploog's October 5 letter on October 7.[4] We also know that HomeSide sent a letter to Ploog on

---

[3] Partly to ensure compliance with RESPA, HomeSide instituted a Loan Tracking System, which produced the computer records referenced in this paragraph. The system, in use during the relevant time period, listed the loan accounts being serviced by HomeSide and tracked any written correspondence between HomeSide and its borrowers in connection with the loans. For example, based on records created by the Loan Tracking System, from October 1999 to October 2000, HomeSide serviced 1,500,000 loans and received 46,596 pieces of written correspondence from borrowers.

Additionally, the Loan Tracking System monitored how long it took HomeSide to resolve any issue that was raised by a borrower via written correspondence. Based on the evidence presented, normally an issue would be closed after a HomeSide representative sent the borrower a written response. In cases where the borrower requested information from HomeSide that HomeSide did not possess, however, HomeSide representatives would often elect to send the borrower a written response explaining why the information was unavailable, and possibly not close the issue (since the borrower's request was not actually resolved). Sometimes issues remained open due to clerical error. From October 1999 to October 2000, 576 issues were left open for longer than sixty days.

Importantly, HomeSide's Loan Tracking System did not identify borrower requests that fit the definition of "qualified written requests" under § 2605(e)(1)(B), nor did HomeSide's Loan Tracking System identify HomeSide responses that complied with the requirements set forth in § 2605(e)(2)(A)–(C). (Duncan Aff. ¶¶ 3-10.)

[4] HomeSide's computer records listed Ploog's October 5 letter as being received on October 7. (HomeSide's Demonstrative Ex. 4.)

October 19, which set forth the conditions to obtain an escrow waiver. By sending the letter, HomeSide believed it answered Ploog's October 5 request.[5]

By November 18, 1999, Ploog discovered that the negative escrow balance resulted from First Chicago's mistaken payment of real estate taxes for properties not owned by Ploog and her husband. Evidently, the Security Instrument, entered into between Ploog and her husband and First Chicago, included incorrect permanent index numbers. Ploog conveyed this information to HomeSide in a November 18, 1999 letter. Additionally, in the same letter Ploog notified HomeSide of the Kenmore property's new permanent index number, asked HomeSide to discontinue making payments from the escrow account, and provided HomeSide with a signed Escrow Waiver Agreement.

Despite the specific instruction not to, HomeSide debited the escrow account to pay certain real estate taxes on December 20, 1999. Then, one day later, HomeSide sent Ploog a letter stating that Ploog and her husband would need to pay off the negative balance of $5916.57 on the escrow account before HomeSide would grant an escrow waiver.[6]

Ploog sent another letter to HomeSide on March 6, 2000. In the letter, Ploog listed the Kenmore property's correct permanent index number and asked HomeSide to update its records

---

[5] HomeSide's computer records listed the issue raised in Ploog's October 5 letter as being resolved on October 19. (*Id.*)

[6] The parties disagree as to whether this letter was in response to Ploog's November 18, 1999 letter. (*See* Second Am. Compl. ¶ 21; Duncan Aff. ¶ 13.) Incidentally, a HomeSide representative listed both Ploog's November 18, 1999 letter and HomeSide's December 18, 1999 letter in the Loan Tracking System. The issue raised in Ploog's November 18 letter was closed on December 21. (HomeSide's Demonstrative Ex. 7.)

accordingly. Attached to the March 6 letter was Ploog's most recent tax bill. HomeSide never responded to the letter.

Over the next five months, Ploog contacted HomeSide via telephone on several occasions to discuss the escrow account. Yet each contact left Ploog unsatisfied with HomeSide's handling of the issue.

Ploog filed a putative class action suit in federal court under 12 U.S.C. § 2605(e)(2)(A)–(C) on October 16, 2000.[7] The complaint stemmed from HomeSide's failure to respond to and correct Ploog's escrow account problem within sixty days of receiving either Ploog's November 18, 1999 letter or Ploog's March 6, 2000 letter — both of which Ploog believed were qualified written requests. On information and belief, Ploog asserted that HomeSide engaged in a pattern or practice of failing to respond to qualified written requests in accordance with § 2605(e)(2)(A)–(C). For relief, Ploog requested statutory damages and costs, including attorney's fees, pursuant to § 2605(f).

Around the same time that she filed the complaint, Ploog received word that HomeSide corrected the escrow account problem. But on October 30, 2000, HomeSide sent Ploog a letter stating that her scheduled escrow payment was $2488.96. A $2488.96 escrow payment would cumulate to over $17,000 per year, despite Ploog's real estate taxes on the Kenmore property only amounting to $3471.42 for the previous year.

---

[7] As discussed more fully in Section II(B) *infra*, § 2605(e)(2)(A)–(C) governs the type of response a servicer, as defined in § 2605(i)(2), must send after receiving a qualified written request, as defined in § 2605(e)(1)(B). *See* 12 U.S.C. §§ 2605(e)(1)(B), (e)(2)(A)–(C), (i)(2).

As a result, Ploog sent HomeSide another letter, this one dated December 1, 2000.[8] In the letter Ploog stated that the escrow account was paid in full as of December 1, 2000, and she indicated that further escrow payments would be in the amount of $1059.12, instead of $2488.96. Attached to the letter was a signed Escrow Waiver Agreement.

A December 20 letter from HomeSide to Ploog informed Ploog that HomeSide had not yet received the escrow payment due December 1, 2000, and therefore, HomeSide had assessed a small fee to Ploog and her husband's loan. If the escrow payment was not immediately made, HomeSide threatened to report Ploog and her husband to a credit agency.

As can be expected, Ploog quickly responded by letter to HomeSide's letter. In two concise paragraphs, Ploog explained why HomeSide's assessment of the escrow account was in error. A third paragraph contained Ploog's request that HomeSide not make a negative reporting to any credit agency. Similar to all of her letters, Ploog concluded by providing contact information where she could be reached.

On January 12, 2001, Ploog received some good news. HomeSide informed Ploog via a letter that, effective with the December 1, 2000 installment, her escrow payments would be reduced to $1059.12. Further, HomeSide informed Ploog that she and her husband would be responsible for payment of real estate taxes on the Kenmore property in the future. (Ploog's request for waiver of the escrow requirement had been approved.)[9]

---

[8] HomeSide claims to have received the December 1 letter on January 10, 2001. (Duncan Aff. ¶ 13.)

[9] HomeSide asserts that the January 12 letter was in response to Ploog's December 1, 2000 letter. Ploog appears to disagree. (*See* Second Am. Compl. ¶ 30; Duncan Aff. ¶ 13.)

But for one reason or another, HomeSide mistakenly reported Ploog to several credit agencies as evidenced by a letter dated January 11, 2001. In a January 23 letter, HomeSide apologized for any inconvenience the reporting might have caused.

Any effect the apology had, however, was not enough to stop Ploog from returning to court to supplement her complaint. On January 23 and February 13 Ploog filed amended complaints, the last of which included the addition of a putative class action claim under 12 U.S.C. § 2605(e)(3) based on the fact that HomeSide reported Ploog and her husband to the credit agencies within sixty days of HomeSide receiving one of Ploog's letters.[10] Ploog contended that, based on information and belief, HomeSide engaged in a pattern or practice of reporting borrowers to credit agencies in violation of § 2605(e)(3).

At last, after many months of class discovery and several extensions of time, we now advise the district court on whether Ploog's RESPA claims are, in fact, properly brought on behalf of a class pursuant to Rule 23(a) and Rule 23(b)(3). At the outset, we note that on July 11, 2001, the parties stipulated to defer a decision on the numerosity requirement of Rule 23(a). Hence, nothing in this report and recommendation should be construed as a finding in favor of or against Ploog on numerosity.

---

[10] As discussed more fully in Section II(B) *infra*, § 2605(e)(3) prohibits a servicer from reporting a borrower to a credit agency within sixty days of receiving a qualified written request. 12 U.S.C. § 2605(e)(3).

## II.    Discussion

### A.    Standard of Review

In deciding a motion for class certification, the court tests whether economy favors adjudicating multiple disputes in a single action, without sacrificing fairness. *Gen. Tel. Co. of the Southwest v. Falcon*, 457 U.S. 147, 155 (1982) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 701 (1979)). Class relief is appropriate only if the class representative establishes that members of the class are "so numerous that joinder is impracticable," that "there are questions of law or fact common to the class," that the claims or defenses of the class representative are "typical of the claims or defenses of the class," and that the class representative "will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a).[11] Additionally, the class representative must show that one of the requirements of Rule 23(b) is met — e.g., "that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members," and that a class action suit is the superior method "for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3). Whether the class representative has satisfied her burden is within the discretion of the court. *Liberles v. County of Cook*, 709 F.2d 1122, 1127 (7th Cir. 1983); *Simer v. Rios*, 661 F.2d 655, 668 (7th Cir. 1981).

The starting point for analysis under Rule 23 is the class action complaint itself. *See Szabo v. Bridgeport Machs., Inc.*, 249 F.3d 672, 677 (7th Cir. 2001). Generally, allegations contained in the complaint will be taken as true. Of course this assumes the absence of any

---

[11] These elements are otherwise referred to as numerosity, commonality, typicality, and adequacy of representation.

impending difficulties, such as choice of law considerations, and the absence of any evidence, by way of affidavit or otherwise, contesting the allegations set forth in the complaint.

When the court confronts such difficulties or evidence, the landscape greatly changes. The allegations in the complaint lose importance, instead what lies beneath those allegations determines the propriety of class certification. "[A]ctual, not presumed, conformance with Rule 23[] remains . . . indispensable." *Gen. Tel. Co. of the Southwest*, 457 U.S. at 160; *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 903 F.2d 176, 180 (2d Cir. 1990) ("[A] class 'may only be certified if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied.'" (quoting *Gen. Tel. Co. of the Southwest*, 457 U.S. at 161)). In other words, a court cannot properly exercise its discretion to certify a class if it takes the word of the movant and turns a blind eye to any conflicts and disputes that are raised. Those conflicts and disputes should be addressed and resolved in favor of class certification before a class action suit proceeds.

Similar inquiries are routinely made in cases involving Rule 12(b)(1) and Rule 12(b)(2). *Szabo*, 249 F.3d at 676. In those cases, courts often conduct inquiries beyond the allegations in the complaint. *See, e.g., Silagi v. First Chi. NBD Corp. Sav. & Inv. Plan*, No. 99 C 7618, 2000 WL 1053959, at *1 (N.D. Ill. July 31, 2000) (quoting *Capitol Leasing Co. v. FDIC*, 999 F.2d 188, 191 (7th Cir. 1993)). Where the opposing party submits uncontradicted evidence on some issue, that evidence may be taken as true and capable of defeating the moving party's request. *See, e.g., Ill. Tool Works, Inc. v. Indep. Packing Serv.*, No. 94 C 1039, 1994 WL 604341, at *1 (N.D. Ill. Nov. 2, 1994) (citing *Wessel Co. v. Surfer Publ'ns*, 633 F. Supp. 729, 730 (N.D. Ill. 1983.)) The same principles equally apply here.

That being said, before turning to the class certification question, a brief explanation of RESPA, particularly the sections pertinent to the instant motion, is in order.

**B.     12 U.S.C. §§ 2601-17**

RESPA regulates the real estate settlement process and the servicing[12] of federally related mortgage loans.[13] *MorEquity, Inc. v. Naeem*, 118 F. Supp. 2d 885, 900 (N.D. Ill. 2000); 12 U.S.C. §§ 2601-17.  With regard to the latter, RESPA imposes a duty on servicers[14] of federally related mortgage loans to respond in writing to borrowers' qualified written requests[15] in one of

---

[12] Servicing means "receiving any scheduled periodic payments from a borrower pursuant to the terms of any loan, including amounts for escrow accounts described in [12 U.S.C. § 2609], and making the payments of principal and interest and such other payments with respect to the amounts received from the borrower as may be required pursuant to the terms of the loan."  12 U.S.C. § 2605(i)(3).

[13] The definition of a "federally related mortgage loan" is found at 12 U.S.C. § 2602(1). A federally related mortgage loan includes a loan secured by a first or subordinate lien on residential real property.  *Id.* § 2602(1)(A).

[14] A servicer is the person "responsible for servicing of a loan."  *Id.* § 2605(i)(2).

[15] A qualified written request is

> a written correspondence, other than notice on a payment coupon or other payment medium supplied by the servicer, that—
>
> (i)     includes, or otherwise enables the servicer to identify, the name and account of the borrower; and
>
> (ii)    includes a statement of the reasons for the belief of the borrower, to the extent applicable, that the account is in error or provides sufficient detail to the servicer regarding other information sought by the borrower.

*Id.* § 2605(e)(1)(B).

three ways, assuming the requests ask for information relating to the servicing of federally related mortgage loans.  First, § 2605(e)(2)(A) allows the servicer to transmit a written notification to the borrower indicating that appropriate corrections to the borrower's account have been made.  12 U.S.C. § 2605(e)(2)(A).  Second, § 2605(e)(2)(B) permits the servicer to send a written explanation to the borrower that includes reasons why the servicer believes that the borrower's account is not in error.  *Id.* § 2605(e)(2)(B).  Third, § 2605(e)(2)(C) allows the servicer to send the borrower a written explanation that includes the information requested by the borrower or the reasons why the requested information is unavailable.  *Id.* § 2605(e)(2)(C).  Regardless of the type of response, RESPA requires the servicer's response to be made within sixty days of receiving the borrower's qualified written request.  *Id.* § 2605(e)(2).

In addition to regulating responses, RESPA also places restrictions on a servicer's ability to make credit reports.  Pursuant to § 2605(e)(3) a servicer cannot report a borrower to a credit agency on a payment issue that the borrower raised in a qualified written request during the sixty-day period beginning on the date of the servicer's receipt of the borrower's qualified written request.  *Id.* § 2605(e)(3).

Ploog employs all of these provisions in her putative class action suit.  Class A consists of "all persons who made a 'qualified written request' . . . to HomeSide Lending, Inc. and with respect to whom HomeSide failed to respond in writing as required by 12 U.S.C. § 2605(e)(2)." (Pl.'s Reply Supp. Mot. Class Cert. at 1.)  Class B consists of "all persons who made a 'qualified written request' . . . to HomeSide Lending, Inc. [and] with respect to whom HomeSide failed to

take corrective action in violation of 12 U.S.C. § 2605(e)(2)."[16]  (Pl.'s Reply Supp. Mot. Class Cert. at 1.)  And Class C consists of "all persons who made a 'qualified written request' . . . that disputed the amount of the debt [owed] to HomeSide Lending, Inc. and with respect to whom HomeSide provided information regarding any overdue payment to any consumer reporting agency during the 60-day period beginning on the date of [HomeSide's] receipt from any borrower of a qualified written request relating to a dispute regarding the borrower's payments in violation of 12 U.S.C. § 2605(e)(3)."  (Pl.'s Reply Supp. Mot. Class Cert. at 1-2.)

We now discuss the propriety of certifying Class A and Class C in light of the prerequisites of Rule 23(a) and Rule 23(b)(3).  *See supra* note 16 (addressing Class B).  Where appropriate, each class is addressed separately.

### C.   Prerequisites to Class Certification Under Rule 23(a)

#### 1.   Commonality

According to Rule 23(a)(2), there must be questions of law or fact common to the class. Fed. R. Civ. P. 23(a)(2).  It is apparent that not all legal or factual questions must be common. *Riordan v. Smith Barney*, 113 F.R.D. 60, 63 (N.D. Ill. 1986).  But the moving party must at least demonstrate the existence of more than one common legal or factual question.  *But see Hill v.*

---

[16]  We recognize the problem, pointed out by HomeSide, with respect to Class B: failing to take corrective action, by itself, cannot constitute a violation of § 2605(e)(2).  Rather, a servicer would also need to fail to provide an explanation as described in § 2605(e)(2)(B)–(C) in order for liability to attach.  If all of these conditions are met, then Class A consumes Class B. For this reason, we will treat Class A and Class B as one, leaving Class C as the only other class.

*Amoco Oil Co.*, No. 97 C 7501, 2001 WL 293628, at *5 (N.D. Ill. Mar. 19, 2001) ("[T]here is at least one common question, and the commonality requirement is met.").

As a general rule, "[a] common nucleus of operative fact is . . . enough to satisfy the commonality requirement of Rule 23(a)(2)." *Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992). A common nucleus of operative fact is normally found where "the defendants have engaged in standardized conduct towards members of the proposed class." *Keele v. Wexler*, 149 F.3d 589, 594 (7th Cir. 1998); *Patrykus v. Gomilla*, 121 F.R.D. 357, 361 (N.D. Ill. 1988); *Franklin v. City of Chicago*, 102 F.R.D. 944, 949 (N.D. Ill. 1984). Such conduct could emanate from the existence of some express policy or from the occurrence of some act — e.g., sending out a contract to customers — that affects all class members the same way. *See Gen. Tel. Co. of the Southwest*, 457 U.S. at 159 n.15; *Patterson v. Gen. Motors Corp.*, 631 F.2d 476, 481 (7th Cir. 1980); *Riordan*, 113 F.R.D. at 63. Either way, the ultimate question remains the same: are there some common questions linking the class members that are substantially related to the resolution of the litigation?

### a. Class A

All borrowers who sent HomeSide a qualified written request but who did not receive a § 2605(e)(2)(A)–(C) response from HomeSide fall into Class A. The common issue Ploog proffers is whether HomeSide engaged in a pattern or practice of such conduct. (Pl.'s Mem. Supp. Pl.'s Am. Mot. Class Cert. at 5.)

In support of her position, Ploog cites to *Spencer v. Central States, Southeast & Southwest Areas Pension Fund*, 778 F. Supp. 985, 989 n.2 (N.D. Ill. 1991), *Franklin*, 102 F.R.D.

- 13 -

at 949, and *Patrykus*, 121 F.R.D. at 361. *Spencer* involved a suit against a pension fund for breach of fiduciary duty. The proposed class consisted of current and former employees who contributed to the fund. The court determined that commonality was satisfied because the breach of duty claim would rise or fall based on the fund's generalized conduct of offering a service to some plan participants and not others. *Spencer*, 778 F. Supp. at 989 n.2. *Franklin* concerned an action brought by an arrested individual against the Chicago Police Department. The individual alleged that transporting arrestees in squadrols without restraining devices violated the constitution. Commonality existed due to the fact that the police department's policy affected the proposed class members, all arrestees transported in squadrols, the same. *Franklin*, 102 F.R.D. at 949-50. *Patrykus* also involved a suit against the Chicago Police Department, but in connection with a raid on a bar (the proposed class consisting of all individuals at the bar at the time of the raid). In *Patrykus*, commonality existed because the claims of the proposed class members were dependent on the constitutionality of the single raid and subsequent searches that took place at the bar. 121 F.R.D. at 361.

All three cases, which are either of the single act or express policy variety, squarely fit within the class action mold. The named plaintiff or plaintiffs presented questions regarding the defendant's intentional conduct, which was common to all members of the proposed class, and a decision on the named plaintiff's or plaintiffs' questions necessarily determined the similar questions that were posed by the proposed class. *See, e.g., Rosario*, 963 F.2d at 1018 (scheme to defraud and deceive prospective students by school); *Wilkinson v. FBI*, 99 F.R.D. 148, 157 (C.D. Cal. 1983) (series of acts by FBI against association allegedly in violation of members' constitutional rights).

Ploog's Class A, on the other hand, does not hold the same shape. Class A aims to cover a large number of borrowers, across a large number of states, interacting with a large number of HomeSide offices, and even more HomeSide representatives, over a fairly long period of time. Class A encompasses proposed class members who did not receive a response from HomeSide that complied with § 2605(e)(2)(A), § 2605(e)(2)(B), or § 2605(e)(2)(C). We refrain from listing each and every way HomeSide could conceivably fail to comply with these provisions; each provision of § 2605(e)(2) contains its own specifics.

This case is also different from *Spencer*, *Patrykus*, *Rosario*, and *Wilkinson* in that the glue holding Class A together is not some act or series of acts common to the class. Nor is Class A held together by a specific HomeSide "policy," in the admitted, explicit sense, like in *Franklin*. Rather, what serves as the glue holding together Class A is an allegation that HomeSide engaged in a pattern or practice of violating § 2605(e)(2)(A)–(C), which, from the way we understand it, is something less concrete than an established policy.

Allegations of pattern or practice often come before courts in the context of class certification. Under these circumstances, a higher level of scrutiny applies. For a Title VII claimant to transform an individual claim into a class action suit via an alleged pattern or practice of discrimination, the court must find that specific facts, supported with affidavits or other evidence, particularly statistics, raise an inference of across-the-board discrimination. *Gen. Tel. Co. of the Southwest*, 457 U.S. at 159 n.15; *Patterson*, 631 F.2d at 481; *Abram v. United Parcel Serv. of Am., Inc.*, 200 F.R.D. 424, 428-33 (E.D. Wis. 2001); *Zapata v. IBP, Inc.*, 167 F.R.D. 147, 158-59 (D. Kan. 1996); *De La Fuente v. Chi. Tribune Co.*, No. 84 C 4596, 1985 WL 2103, at *2-8 (N.D. Ill. July 24, 1985). Outside the Title VII context, a similar threshold has been

established. *In re LifeUSA Holding, Inc.*, 242 F.3d 136, 145-47 (3d Cir. 2001); *Paciello v. UNUM Life Ins. Co. of Am.*, 188 F.R.D. 201, 205 (S.D.N.Y. 1999). *But see McDonald v. Wash. Mut. Bank, FA*, No. 99 C 6884, 2000 WL 875416, at *2 (N.D. Ill. June 26, 2000).[17] Courts recognize the wide gap between an individual claim and the existence of a class of persons that possess sufficiently similar claims, as well as the fact that some unifying thread must connect all members of the proposed class in order for common questions to exist among the proposed class.

In an effort to close that gap and establish some uniformity among the proposed class members in this case, Ploog points this Court to complaints made by purported HomeSide borrowers to the Federal Trade Commission; complaints posted by purported HomeSide borrowers on *The Complaint Station* and *HomeSide Lending Complaints*, both Internet bulletin boards; "admissions" from HomeSide's own computer records; a settlement entered into between Florida and HomeSide; a settlement entered into between West Virginia and HomeSide; and various letters drafted by or on behalf of Vincente Garcia and Jesus Perez, both of whom borrowed funds from HomeSide at some point in time. On the other hand, Ploog offers not a single affidavit.

The nineteen FTC complaints contain information submitted by alleged HomeSide borrowers. In a paragraph or two, all of the borrowers criticize some aspect of HomeSide's actions in connection with the borrowers' loans — the common denominator being how much the borrowers should have to pay HomeSide. Most of the complaints state that written correspondence was sent to HomeSide, but some do not; and most of the complaints state that

---

[17] In *McDonald*, a case that involves similar facts and § 2605(e)(2)(A)–(C), neither party contested the issue of commonality or typicality. 2000 WL 875416, at *2-3.

HomeSide sent some written correspondence to the borrowers, but some do not. Some borrowers accuse HomeSide of negligence, while others accuse HomeSide of fraud.

The FTC complaints are sufficient to raise an inference of unhappy customers, and to raise an inference that HomeSide representatives here and there may not be performing satisfactorily. But, in light of the markedly different requests made by the purported HomeSide borrowers in the FTC complaints, and the markedly different responses they hoped to receive from HomeSide, we find that the FTC complaints are not specific evidence of HomeSide engaging in an across-the-board violation of § 2605(e)(2)(A)–(C). In other words, nothing in the FTC complaints specifically shows that HomeSide treated its borrowers in the same fashion.

Furthermore, in light of the vast number of loans serviced by HomeSide, we find that nineteen FTC complaints offer little in the way of establishing a pattern or practice of conduct. Statistically, the FTC complaints are simply insignificant.

We find HomeSide's Internet complaints to be insufficient to show a pattern or practice of an across-the-board violation of § 2605(e)(2)(A)–(C) as well. Ploog downloaded the complaints from www.thecomplaintstation.com and www.homesidecomplaint.com. The material taken from www.complaintstation.com hardly contains any substantive information at all — e.g., no mention of written correspondence, specific complaints, etc. Rather, the material is replete with profanity and offensive statements. For instance, one of the discussion subjects states: "Shut this HSL hell-hole down . . . euthanize!!!" (Pl.'s Mem. Supp. Pl.'s Am. Mot. Class Cert. Ex. Q at 34.) This is not the kind of specific information necessary to support a class action suit.

Notwithstanding that, the fact that HomeSide has shown that a number of the postings on www.complaintstation.com are false cautions against considering the information.[18]

Complaints taken from www.homesidecomplaint.com, on the other hand, resemble the FTC complaints in the sense of containing some substantive information. Nevertheless, we find the www.homesidecomplaint.com complaints insufficient for the same reasons that we found the FTC complaints insufficient: the www.homesidecomplaint.com complaints do not specifically show that HomeSide treated its borrowers in the same fashion; and statistically, the www.homesidecomplaint.com complaints are simply insignificant.

Turning to HomeSide's own computer records, the information gleaned from the Loan Tracking System tells us that, out of 1,500,000 loans serviced from October 1999 to October 2000, HomeSide received 46,596 pieces of written correspondence from borrowers. Assuming each of these letters raised an "issue," we know that 576 issues remained "open" for longer than sixty days. As stated by Vicki Duncan, HomeSide's Vice President of Customer Service, HomeSide representatives do not open issues upon a conclusion that the written correspondence constitutes a qualified written request — they open issues upon receiving a piece of written correspondence.[19] (Duncan Aff. ¶¶ 4-10.) Further, "open past sixty days" does not

---

[18] An investigation by HomeSide led to the individual behind Tireman@aol.com admitting that the allegations he posted on www.thecomplaintstation.com were false. (HomeSide's Mem. Opp'n Pl.'s Am. Mot. Class Cert. Ex. 6.) In Ploog's www.thecomplaintstation.com exhibit, postings by Tireman@aol.com appear on numerous pages. (*See* Pl.'s Mem. Supp. Pl.'s Am. Mot. Class Cert. Ex. Q.)

[19] Indeed, as HomeSide pointed out, some of the 576 issues that were left open for longer than sixty days were raised in letters that, even in the light most favorable to Ploog, cannot be construed as qualified written requests. (*See* HomeSide's Demonstrative Exs. 8-10.)

mean "in violation of § 2605(e)(2)(A)–(C)." (*Id.*) In light of these facts, we find that class

certification cannot be based on HomeSide's computer records. The Loan Tracking System does

not provide specific information that evidences a pattern or practice of violating

§ 2605(e)(2)(A)–(C).

The Florida settlement arose out of an investigation into HomeSide's business policies

and practices regarding borrower inquiries and complaints pursuant to the Florida Deceptive and

Unfair Trade Practices Act. HomeSide denied any wrongdoing or liability, but agreed to enter

into the settlement with Florida. The terms of the settlement require HomeSide to comply with

various laws, including RESPA. It also requires HomeSide to implement certain improvements

such as the construction of a new facility and the enhancement of certain employee salaries. The

settlement expressly states that the settlement "does not constitute an admission of any kind" by

HomeSide regarding the Florida investigation. (Pl.'s Reply Supp. Mot. Class Cert. Ex. A at 5.)

Surely the settlement creates an inference that HomeSide has knowledge that borrowers

have complained of loan servicing problems, but the settlement, considering its general language

and passing reference to RESPA (not the particular provisions of § 2605(e)(2) pertinent to this

case), cannot raise an inference of an across-the-board violation of § 2605(e)(2)(A)–(C). The

settlement cannot even raise an inference that loan servicing problems actually occurred, much

less that loan servicing problems occurred as a result of HomeSide's practices. *See United States*

*v. Austin*, 54 F.3d 394, 400 (7th Cir. 1995); *Naugles v. Sheahan*, No. 98 C 6637, 2000 WL

1700131, at *2 (N.D. Ill. Oct. 16, 2000).

Ploog has not submitted the actual West Virginia settlement agreement, but the

documents that Ploog has submitted indicate that the settlement arose out of borrower complaints

- 19 -

in connection with the payment of real estate taxes and insurance premiums. Apparently, under the terms of the settlement, HomeSide agreed to establish procedures to ensure that borrowers' accounts are properly and accurately credited and that borrowers' property taxes and insurance premiums are promptly and accurately paid each year.

None of the West Virginia documents mention RESPA or comment on HomeSide's receipt of or response to written correspondence. For obvious reasons, the West Virginia settlement cannot raise an inference of an across-the-board violation of § 2605(e)(2)(A)–(C).

That leaves Ploog with the various letters purportedly written by or on behalf of Garcia and Perez. Garcia wrote nine letters to HomeSide from December 1998 to August 1999, all pertaining to an escrow account. Statements in the letters suggest that HomeSide never responded to Garcia's concerns. Similarly, Perez sent a series of letters to HomeSide from August 1999 to October 1999 relating to mortgage payments. It appears that HomeSide never responded to Perez's letters.

We believe that the Garcia and Perez letters, like the FTC complaints, raise an inference of unhappy borrowers and some unsatisfactory HomeSide representatives, but the Garcia and Perez letters, like the FTC complaints, are insufficient to raise an inference of HomeSide engaging in a pattern or practice of violating § 2605(e)(2)(A)–(C); the letters do not specifically show that HomeSide treated its borrowers in the same fashion; and statistically, the letters are simply insignificant.

Lest we be charged with failing to consider Ploog's evidence in its entirety, we state that all of it has been considered together. In its entirety, the evidence raises an inference that HomeSide has some unhappy borrowers and some unsatisfactory representatives. Yet, it does

not specifically demonstrate that HomeSide engaged in a pattern or practice of violating

§ 2605(e)(2)(A)–(C). We refuse to join Ploog in her leap from the premise that "HomeSide

failed to properly respond to me" to the position that "HomeSide uniformly failed to properly

respond to others." Furthermore, statistically speaking, based on the evidence presented,

HomeSide's alleged violation of § 2605(e)(2)(A)–(C) with respect to Ploog is not the rule, but the

exception. Hence, maintenance of Ploog's § 2605(e)(2)(A)–(C) claim as a class action suit will

not advance "the efficiency and economy of litigation which is a principal purpose of [Rule 23]."

*Am. Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 553 (1974). Ploog's Amended Motion for Class

Certification of Class A should be denied.


### b. Class C

The glue holding together Class C is also an allegation of pattern or practice: Ploog

contends that HomeSide engaged in a pattern or practice of reporting borrowers to credit

agencies within sixty days of receiving the borrowers' qualified written requests. To support this

charge, Ploog points to the same evidence that was discussed in connection with Class A.

Briefly, a few of the FTC and Internet complaints but neither the settlements nor the

Garcia and Perez letters discuss HomeSide's practice of credit reporting in any detail. For the

reasons stated in Section II(C)(1)(a), we find the evidence insufficient to establish a pattern or

practice of an across-the-board violation of § 2605(e)(3).

2. <u>Typicality</u>

Even if Class A and Class C had common questions of law or fact, we would not certify

the classes because Ploog's claims are atypical of the claims of the proposed members in either

class. To satisfy Rule 23(a)(3), the class representative must show that her claims or defenses are

typical of the claims or defenses of the class. Fed. R. Civ. P. 23(a)(3). Typical means "hav[ing]

the same essential characteristics." *Spencer*, 778 F. Supp. at 989 (quoting *De La Fuente v.*

*Stokely-Van Camp, Inc.*, 713 F.2d 225, 232 (7th Cir. 1983)). As a general rule, the class

representative's claims have the same essential characteristics as the claims of the class at large if

all of the claims arise from the same event or practice or course of conduct and all of the claims

are based on the same legal theory. *De La Fuente*, 713 F.2d at 232; *Perez v. Pers. Bd. of Chi.*,

690 F. Supp. 670, 673 (N.D. Ill. 1988) ("Typicality is met . . . 'when it is alleged that the same

unlawful conduct was directed at or affected both the named plaintiff and the class sought to be

represented . . . .'" (quoting *Edmondson v. Simon*, 86 F.R.D. 375, 381 (N.D. Ill. 1980))).

Otherwise stated, typicality is satisfied if the class representative can "establish the bulk of the

elements of each class member's claims when [she establishes her] own claims." *Brooks v.*

*S. Bell Tel. & Tel. Co.*, 133 F.R.D. 54, 58 (S.D. Fla. 1990) ("If proof of the representatives'

claims would not necessarily prove all the proposed class members' claims, the representatives'

claims are not typical of the proposed members' claims.").

Factual variations do not always create atypicality. *Riordan*, 113 F.R.D. at 63. For

instance, where common questions almost entirely establish liability but individual issues such as

reliance remain, typicality is usually satisfied. *Heastie v. Cmty. Bank of Greater Peoria*, 125

F.R.D. 669, 676 (N.D. Ill. 1989); *Ridings v. Can. Imperial Bank of Commerce Trust Co.*, 94

F.R.D. 147, 151 (N.D. Ill. 1982). Where the defendant's liability to the members of the proposed class cannot be established by the same event or practice or course of conduct, however, factual discord poses a problem. A mix of markedly different facts even with a similar legal theory signals atypicality. *Spencer*, 778 F. Supp. at 990-91.

Here, neither party has afforded typicality much attention. Ploog, who bears the burden on the issue, merely states, "In the instant case, typicality is inherent in the class definitions. By definition, each of the class members made a 'qualified written request' . . . to HomeSide concerning their mortgage which was not handled properly." (Pl.'s Mem. Supp. Pl.'s Am. Mot. Class Cert. at 7.) HomeSide relegated typicality to footnote number twelve.

### a. Class A

A review of § 2605(e)(2)(A)–(C), and each provision's transaction-specific nature, demonstrates just how inherently wrong Ploog's position is with respect to Class A. As explained in Section II(B), after receiving a qualified written request, a servicer can avoid liability under § 2605(e)(2) by performing one of three actions: correction and notification, explanation without correction, or explanation with information. Conceivably, § 2605(e)(2)(A), § 2605(e)(2)(B), or § 2605(e)(2)(C) could be violated differently; each provision requires the servicer to perform more than one task. This alone creates a degree of variance among the proposed class members.

The variance expands when one considers that a prerequisite to § 2605(e)(2) liability is the borrower's qualified written request. The content of a qualified written request by definition must contain its own unique facts — e.g., the borrower's name, account number, and problematic

- 23 -

situation. *See* 12 U.S.C. § 2605(e)(1)(B). Since the unique facts of a qualified written request trigger a servicer's response, a response too, by definition, must contain its own set of unique facts — namely, the information that the borrower needs. *See id.* § 2605(e)(2)(A)–(C). In a class action suit under § 2605(e)(2)(A)–(C), these two premises translate into many claims with markedly different facts. Essentially, the only unifying thread holding together the claims of the proposed class would be the mere allegation that a violation of § 2605(e)(2)(A)–(C) occurred.

For example, according to Ploog, HomeSide violated § 2605(e)(2)(A)–(C) by not responding at all to Ploog's March 6, 2000 letter, which provided the Kenmore property's new permanent index number. Even if the district court finds this to be true, this offers no solace to the class member who sent in a qualified written request regarding an insurance premium and who received, what he believed to be, an inadequate explanation — but still an explanation — from HomeSide. Nor would Ploog's proving her § 2605(e)(2)(A)–(C) claim assist the borrower who sent in a qualified written request relating to his escrow account and who received from HomeSide a correction and notification without a credit of late charges — which would still amount to a violation of § 2605(e)(2)(C).

What these few examples demonstrate is that, at least in this case, no two borrower situations are alike for purposes of § 2605(e)(2)(A)–(C). The essential characteristics of each proposed class member's claim — what the borrower wanted HomeSide to do and what HomeSide failed to do — are unique. In other words, assuming HomeSide injured a group of borrowers, it did not do so in a uniform way.

With a semblance of uniformity lacking, Ploog's particular § 2605(e)(2)(A)–(C) claim will not necessarily prove all of the proposed class members' claims. For that reason, typicality is unsatisfied and Ploog's Amended Motion for Class Certification of Class A should be denied.

b.      **Class C**

The transaction-specific nature of § 2605(e)(3) justifies a finding of atypicality in connection with Class C, also. A servicer violates § 2605(e)(3) if it reports a borrower to a credit agency <u>on a specific payment issue</u> within sixty days of <u>that specific payment issue</u> being raised in a <u>qualified written request</u>. Hence, in each and every case involving § 2605(e)(3), two documents must always be examined — the written request and the credit report — with close attention being paid to the specific payment issues addressed in each document.

The content of the written requests of the proposed class members will undoubtedly contain markedly different facts and thus raise different payment issues for the reasons stated in Section II(C)(2)(a). Likewise, the credit reports sent by HomeSide on those proposed class members will undoubtedly contain markedly different facts and thus raise different payment issues. After all, each credit report is tailored to address a specific payment issue with a specific borrower's account.

Again we confront a situation where the essential characteristics of each proposed class member's claim — what the borrower wanted HomeSide to do and what HomeSide did do — are unique. As it turns out, the only unifying thread holding together Class C, similar to Class A, is the allegation that a violation of § 2605(e)(3) occurred.

For instance, suppose the district court finds that HomeSide violated § 2605(e)(3) when it reported Ploog to the credit agencies in connection with the mistaken late escrow payment; this assumes that Ploog addressed the escrow payment in a qualified written request sent to HomeSide within sixty days prior to HomeSide's reporting of Ploog. When the next class member steps up to assert his claim, the district court would have to look at the class member's written request — not Ploog's — and HomeSide's credit report on the class member — not its report on Ploog — to make a § 2605(e)(3) liability finding. The only benefit to the district court of having made a decision on Ploog's claim would be that it acquired some sense of familiarity with § 2605(e)(3). This is not what typicality is about.

Consequently, because Ploog could not establish the bulk of elements of the proposed class members' § 2605(e)(3) claims by proving her own § 2605(e)(3) claim, Ploog's Amended Motion for Class Certification of Class C should be denied. There is no unifying theme holding together Class C that makes class certification worthwhile.[20]

### 3. Adequacy of Representation

In light of the ethical accusations made by HomeSide against Ploog's counsel, we briefly address this aspect of Rule 23(a). Rule 23(a)(4) has been interpreted to require the court to

---

[20] Our decision on typicality finds support in *Spencer*, which was cited by Ploog. *Spencer* involved a proposed class of current and former employees who allegedly took some action based on representations made by various people. The representations were communicated orally at twenty-seven different meetings and no two communications were the same. Because questions such as what representation was made, by whom, etc., differed from employee to employee, the court held that typicality was not satisfied. *See Spencer*, 778 F. Supp. at 990-91. In many ways, the instant case is similar to one based on a medley of distinct oral representations; claims share nothing significant in common.

assess the class representative's counsel before certifying a class. *Greisz v. Household Bank*, 176 F.3d 1012, 1013 (7th Cir. 1999); *Wagner v. Lehman Bros. Kuhn Loeb Inc.*, 646 F. Supp. 643, 661-62 (N.D. Ill. 1986). This inquiry involves an examination of counsel's competence and experience as well as counsel's adherence to ethical rules. *Wagner*, 646 F. Supp. at 661-62. Insufficient ability or evidence of bad character may render counsel unsuitable as class counsel at any time regardless of how much effort he or members of his firm have expended on the case.

HomeSide's attack in this case relates to a message posted by Ploog's counsel on an Internet bulletin board, *The Complaint Station*. The message read: "We are interested in finding out if you have had problems communicating with HomeSide Lending. We represent a borrower who has filed suit against the company based on such a complaint." (HomeSide's Mem. Opp'n Pl.'s Am. Mot. Class Cert. Ex. 7.) As an attempt to directly solicit prospective clients, HomeSide argues, the message violates Illinois Rule of Professional Conduct 7.3.

The argument is untenable for an important reason: The message cannot reasonably be construed as a solicitation of business. Significantly, by the time the message was posted, well after Ploog filed her complaint, Ploog's counsel already had Ploog, the only client the law firm needed. This fact, coupled with the content of the message, demonstrates that, rather than an attempt to generate business, the Internet message was an attempt to generate facts, in the same way an attorney hits the streets looking for witnesses after a client complains of injury. Instead of demonstrating bad character, Ploog's counsel's conduct demonstrates competent representation. Overall, we find no basis for holding Ploog's counsel inadequate.

## D. Prerequisites to Class Certification Under Rule 23(b)(3)

Even if there were commonality and typicality, we would not certify Class A or Class C because neither of the classes satisfies the requirements of Rule 23(b)(3). A class action suit can be maintained under Rule 23(b)(3) only if questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and if the class action device is the superior method of resolving the controversy. Fed. R. Civ. P. 23(b)(3). The basic function of both of these elements is to ensure that before a class action suit is maintained a determination is made that the class action suit will "achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *Id.* advisory committee's note; *see Halverson v. Convenient Food Mart, Inc.*, 69 F.R.D. 331, 337 (N.D. Ill. 1974).

### 1. Class A

Whatever the common questions might be, it cannot be contested that individual questions pervade the qualified written request inquiry and the § 2605(e)(2)(A)–(C) response inquiry—the two core inquiries of any proposed class member's case. With regard to the former, Ploog minimizes the inquiry and its importance, citing to *McDonald*, 2000 WL 875416, at *5.

In *McDonald*, a case very familiar to Ploog's counsel (they represented the class representative), the court certified a class under § 2605(e)(3) in part because it "d[id] not require much for a correspondence to constitute a 'qualified written request.'" 2000 WL 875416, at *4-5. The court rejected the defendant's argument that the individual factual questions involved in

determining whether a correspondence constituted a qualified written request defied class

certification. *Id.*

We disagree with *McDonald* insofar as it minimizes the qualified written request inquiry.

True, determining whether a written correspondence contains the borrower's name and account

number should be easy. But determining whether a written correspondence contains a request for

information relating to the "servicing" of the borrower's loan will often be a subject of dispute.[21]

At least here, the district court would not be looking over standard forms with checked boxes;

rather, it would be parsing hand or typewritten documents sometimes less than artfully drafted.

It is highly likely that reasonable minds would differ as to what the documents contain.

We think that the individualized nature of determining whether a written request is, in

fact, a qualified written request ends the discussion on predominance and superiority. When

documents must be examined and debated one at a time in connection with each and every

proposed class member to establish the defendant's liability to any proposed class member,

individual questions predominate and the economical benefits of the class action device cannot

be achieved. *See Hill*, 2001 WL 293628, at *7-8; *Early v. Old Kent Mortgage Co.*,

No. 99 C 7558, 1999 WL 1101207, at *1-2 (N.D. Ill. Dec. 1, 1999).

In any event, since determining whether HomeSide properly responded to any proposed

class member's qualified written request also involves an individualized inquiry, we need not rely

solely on the nature of the qualified written request to support our recommendation on

---

[21] Ploog's March 6, 2000 letter provides one good example. In our opinion, it is not fairly easy to determine whether Ploog's March letter contains a "request for information relating to the servicing of [her] loan." (*See* Second Am. Compl. Ex. D.)

predominance and superiority.[22]  Similar to the qualified written request inquiry, the response

inquiry will likely entail a document-by-document examination and debate.  The disputes will

likely range from whether HomeSide made the requested correction and whether HomeSide

adequately explained its position to the most basic question of all: whether HomeSide's written

correspondence was, in fact, responsive to a qualified written request.

In short, no economies of scale will result by certifying Class A.  Individual issues

predominate, thus making the class action device an inappropriate method of dispute resolution.


### 2.   Class C

Ploog cannot satisfy Rule 23(b)(3) with respect to Class C, either.  The inquiries central

to § 2605(e)(3) liability pertain to whether the borrower made a qualified written request and

whether the information reported by the servicer to the credit agency related to payment

information contained in the borrower's qualified written request.

Our preceding discussion with respect to qualified written requests equally applies here.

In short, the individualized inquiry that must be undertaken to determine whether a class member

sent HomeSide a qualified written request shows that individual issues predominate and the

economical benefits of the class action device cannot be achieved.

But again, we need not rely solely on this finding to deny class certification because

determining whether HomeSide reported a borrower to a credit agency in violation of

---

[22] For the reasons stated in Section II(C)(1)(a), we reject Ploog's argument that this Court
can pretermit an inquiry into whether HomeSide responded to borrowers in accordance with
§ 2605(e)(2)(A)–(C) based on the information revealed by HomeSide's Loan Tracking System.

§ 2605(e)(3) involves another individualized inquiry that provides additional ground to deny class certification. In this regard, we find ourselves in disagreement with the *McDonald* court for a second time.

In *McDonald*, the class representative sought to certify a class under § 2605(e)(3). "Because the 'qualified written requests,' the dates defendant received these requests, and the dates any delinquency was reported to a credit bureau [were] all fairly easy to determine," the court certified the class — in effect minimizing the credit report inquiry. 2000 WL 875416, at *5.

Surely dates matter (§ 2605(e)(3) states that the credit report must be made within sixty days of a qualified written request) and dates are fairly easy to determine, but we agree with HomeSide that the credit report inquiry entails much more than determining dates, and thus a more difficult inquiry. As discussed in Section II(C)(2)(b), § 2605(e)(3) liability depends on a connection between the qualified written request and the credit report. If the connection is lacking — e.g., the written request concerns the May insurance premium but the credit report concerns payment of the June real estate taxes — then there is no § 2605(e)(3) liability. The *McDonald* court never mentioned this point.

Consequently, determining § 2605(e)(3) liability involves not just a cursory review of the credit report, but another layer of transaction-specific inquiry — examining the content of the credit report and comparing it with the qualified written request. Making or refuting the match required by § 2605(e)(3) on a document-by-document basis in connection with each and every member of the proposed class is not the sort of thing class action suits are made of, for reasons

discussed throughout this recommendation. Accordingly, Ploog's Amended Motion for Certification of Class C should be denied.

### III.     Conclusion

For the reasons stated, this Court recommends that Ploog's Amended Motion for Class Certification be denied in its entirety. The parties are hereby advised that any objection to this Report and Recommendation must be filed within ten working days after service of this Report and Recommendation. 28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b). Failure to object will constitute a waiver of objections on appeal. *Johnson v. Zema Sys. Corp.*, 170 F.3d 734, 739 (7th Cir. 1999); *Video Views, Inc. v. Studio 21, Ltd.*, 797 F.2d 538, 539-40 (7th Cir.1986).

**MARTIN C. ASHMAN**
United States Magistrate Judge

**Dated:** August 27, 2001.

Written objections to any finding of fact, conclusion of law, or the recommendation for disposition of this matter must be filed with the Honorable Ronald A. Guzman within ten (10) days after service of this Report and Recommendation. *See* FED. R. CIV. P. 72(b). Failure to object will constitute a waiver of objections on appeal.

Copies have been mailed to:

DAVID A. EDELMAN, Esq.
CATHLEEN M. COMBS, Esq.
JAMES O. LATTURNER, Esq.
TARA L. GOODWIN, Esq.
KEITH J. KEOGH, Esq.
Edelman, Combs & Latturner
120 South LaSalle Street
18th Floor
Chicago, IL 60603

LeANN PEDERSEN POPE, Esq.
STEPHEN R. MEINERTZHAGEN, Esq.
MARJORIE G. WILDE, Esq.
Burke, Warren, MacKay & Serritella, P.C.
One IBM Plaza
330 North Wabash Avenue
22nd Floor
Chicago, IL 60611-3607

LYNN A. GOLDSTEIN, Esq.
BARBARA ANDERSON WALD, Esq.
Bank One, N.A.
1 Bank One Plaza, 11th Floor
Suite 0286
Chicago, IL 60670-0286

Attorneys for Plaintiff

Attorneys for Defendants